UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AUDRIE BRONKEMA,

                Plaintiff,                         Hon. Ellen S. Carmody

v.

                                           Case No. 1:18-cv-291

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/


## OPINION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's

claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under

Titles II and XVI of the Social Security Act.   The parties have agreed to proceed in this Court for

all further proceedings, including an order of final judgment.   Section 405(g) limits the Court to

a review of the administrative record and provides that if the Commissioner's decision is supported

by substantial evidence it shall be conclusive.   The Commissioner has found that Plaintiff is not

disabled within the meaning of the Act.   For the reasons stated below, the Court concludes that

the Commissioner's decision is supported by substantial evidence.   Accordingly, the

Commissioner's decision is **affirmed**.


## STANDARD OF REVIEW

        The Court's jurisdiction is confined to a review of the Commissioner's decision and

of the record made in the administrative hearing process.   *See Willbanks v. Sec'y of Health and*

*Human Services*, 847 F.2d 301, 303 (6th Cir. 1988).   The scope of judicial review in a social

security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 25 years of age on her alleged disability onset date. (PageID.457). She successfully completed high school and worked previously as a store laborer and hand packager. (PageID.75). Plaintiff applied for benefits on February 25, 2013, alleging that she had been disabled since February 18, 2013, due to a "pseudo tumor cerebrae,"[1] severe back pain, chronic headaches, severe head pressure, light headedness, dizziness, nausea, back pain, poor balance, limited depth perception, blurred and double vision, severe burning pain in feet, and tingling of the hands and fingers. (PageID.457-71, 524).

Plaintiff's applications were denied initially and following a hearing before an Administrative Law Judge (ALJ). (PageID.243-79). The Appeals Council subsequently remanded the matter for consideration of newly submitted medical evidence. (PageID.282-84). On September 23, 2016, Plaintiff appeared before ALJ Michael Condon with testimony being offered by Plaintiff, a vocational expert, and a medical expert. (PageID.87-157). In a written decision dated January 4, 2017, the ALJ determined that Plaintiff was not disabled. (PageID.48-76). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.28-33). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

---

[1] This appears to be a reference to pseudotumor cerebri, a circumstance in which a person experiences intracranial pressure, and symptoms such as headaches and vision difficulties, "for no obvious reason." *See* Pseudotumor cerebri, available at https://www.mayoclinic.org/diseases-conditions/pseudotumor-cerebri/symptoms-causes/syc-20354031 (last visited on Feb. 26, 2019).

3

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined.

---

[2]    1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2.    An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4.    If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5.    If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

*See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) Lyme disease with Bartonellosis and Babesia infections; (2) migraine headaches; (3) degenerative disc disease; (4) history of adhesive capsulitis of the right shoulder with myositis; (5) obesity; (6) an affective disorder, primarily bipolar disorder; (7) an anxiety disorder; and (8) a history of attention deficit, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.51-57).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she can lift/carry up to 10 pounds; (2) during an 8-hour workday she can sit for 6 hours and walk for 2 hours; (3) she can occasionally climb ramps and stairs and when climbing stairs she can climb up to one flight of eight stairs at one time; (4) she can occasionally balance, stoop, kneel, crouch, and crawl; (5) she can never climb ladders, ropes, or scaffolds; (6) she cannot perform over-the-shoulder reaching bilaterally; (7) she can have no exposure to hazards, including unprotected heights and dangerous moving machinery; (8) she cannot operate motorized vehicles as part of her job duties; (9) she cannot operate leg or foot controls bilaterally; (10) she is limited to simple, routine work that involves making simple work-related decisions and tolerating occasional workplace changes; (11) she is limited to working in a low-stress work environment that involves doing jobs that have no specific or fast-pace production quotas or requirements; (12) she can have

5

occasional contact with co-workers and the general public; and (13) she requires the option to alternate sitting and standing with sitting for up to 30 minutes at a time then standing for about 5 to 10 minutes before sitting again.   (PageID.57-58).

The ALJ found that Plaintiff was unable to perform her past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.   *See Richardson*, 735 F.2d at 964.   While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).   This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.   *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding.   Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 167,000 jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.   (PageID.139-48).   This represents a significant number of jobs.   *See, e.g., Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant'").

## I.     Medical Evidence

In addition to the testimony presented at the administrative hearing, the administrative record contains copies of Plaintiff's statements and medical treatment records. The ALJ described this evidence as follows:

> In January 2010, prior to the alleged onset date, an MRI of the cervical spine showed only minimal degenerative changes with no significant neuroforaminal or spinal canal narrowing (Ex. 6F/10). In July 2010, an MRI of the brain revealed a cystic focus in the left cerebrum, but was otherwise unremarkable (Ex. 6F/14). In January 2011, an MRI of the brain revealed was stable since a prior study in 2010 and demonstrated no acute abnormality (Ex. 6F/l l-12). In May 2012, an MRI of the brain showed stable findings compared to prior studies with the small benign appearing cyst within the periventricular white matter thought to be almost certainly of no clinical significance (Ex. 7F/43-44). The study is otherwise unremarkable (Ex. 7F/43-44). In January 2013, a CT scan of the head was unremarkable (Ex. 5F/9-10). In April 2014, x-ray imaging of the right shoulder was normal (Ex. 17F/26). In May 2014, an MRI of the cervical spine showed probably very early disc desiccative change involving C2-C3 through C5-C6 disc levels; however, this was noted to be unchanged since January 2010 (Ex. 19F/5-6). She had no significant abnormality of the cervical spine including no evidence for focal disc herniation or central spinal canal stenosis as well as no cervical nerve root compromise (Ex. 19F/6). An MRI of the brain showed mild fluid in the right mastoid air cells with air-fluid levels and a small cyst in the left parietal lobe; however, there was other source of headache is identified with the cyst was unchanged since 2010 and thought to be almost certainly is of no clinical significance (Ex. 19F/7). In June 2014, a Lyme disease titer was negative (Ex. 26F/23). In March 2015, an MRI of the right shoulder showed abnormal signal consistent with tendinopathy or tendonitis as well as fluid in the subacromial/subdeltoid bursa; however, there was no evidence of a tear or atrophy (Ex. 38F/59). An MRI of the cervical spine was negative (Ex. 40F/7). In April 2015, an MRI of the claimant's right knee showed a small effusion and mild patellofemoral degenerative changes, but was otherwise unremarkable (Ex. 40F/5). In October 2015, x-rays of the right knee were unremarkable (Ex. 38F/36). In December 2015, an MRI of the lumbar spine was normal (Ex. 35F/16). In March 2016, an MRI of the left knee showed minimal degenerative changes within the patellofemoral compartment and a small amount of nonspecific soft tissue edema; however, the study was otherwise unremarkable (Ex. 38F/55-56). In July 2016, x-rays of the right knee and right hip were unremarkable (Ex. 5lF/2). In August 2016, it was noted that the results of an electromyogram were normal (Ex. 56F/l).
>
> The objective examination findings also do not support the extent of the claimant's alleged limitations. The claimant has reported subjective tenderness upon

palpation, pain upon range of motion, and/or diffuse pain *(See* Ex. 7F/3-5; 8F/l; 9F/2; 13F/4; 15F/l; l 7F/13; 18F/l-2; 20F/l; 22F/5; 25F/6; 29F/3; 34F/l-2, 8, 18-24, 30; 36F/27, 30, 33, 46; 37F/4; 38F/12, 35, 51-52; 42F/1-6; 45F/24; 47F/9; and 51F/l). In January 2013, the claimant appeared uncomfortable, presenting with modest neck stiffness during one evaluation and myosis at another evaluation (Ex. 5F/3-7 and 7F/15). During a neurological evaluation in February 2013, she guarded her low back with movement (Ex. 6F/16). At an evaluation with her primary care provider, it was noted she was in poor condition and that she had reduced range of motion, although her extension was near normal (Ex. 7F/5). In March 2013, the claimant had hyperesthesia along the spinous process (Ex.7F/3). At a neurology evaluation in April 2013, she had moderate muscle tension (Ex. 9F/2). In July 2013, the claimant appeared uncomfortable and presented with trigger points in the neck, back, forearms, upper arms, and thighs (Ex. 8F/l). During an office visit in April 2014, the claimant appeared to be vomiting clear fluid (Ex. 18F/l). She would not allow her arm to be examined, refusing to try range of motion testing due to reports of pain (Ex. 18F/l). The claimant subsequently sought emergent evaluation, during which she presented with vomiting and dry heaves; however this ceased after she was given an anti-nausea medication (Ex. l 7F/6-7 and 11-12). In May 2014, at an emergency room evaluation of neck pain and a headache, the claimant was dry heaving, although this was subsequently well controlled with treatment (Ex. 19F/4-5). Subsequently in May 2014, she had multiple skin lesions as well as decreased range of motion of the neck and right shoulder (Ex. 20F/l; *See also* Ex. 25F/5). In July 2014, she had reduced sensation in the right extremities (Ex. 30F/2). In August 2014, she had reduced range of motion and a positive Spurling's maneuver (Ex. 29F/3). During evaluation in October 2014, she presented with guarding, reduced strength, and limited right shoulder motion (Ex. 34F/24; *See also* Ex. 34F/30 and 36F/46).

In January 2015, she had reduced right shoulder range of motion and strength during a physical therapy session (Ex. 34F/16; *See also* Ex. 34F/18-22). In March 2015, at a physical therapy session, she had reduced lower extremity strength and range of motion (Ex. 34F/l; *See also* Ex. 34F/4-10). At a neurological evaluation, she had mild left eye disc enlargement with a blurred disc margin as well as decreased sensation to light touch, pinprick, and temperature with increased right lower extremity reflexes, positive Spurling's maneuver, and difficulty performing a heel to toe tandem gait testing (Ex. 35F/7-8). During an orthopedic evaluation, she had multiple excoriations, abnormal right knee range of motion with hypermobility, reduced right shoulder range of motion, and positive apprehension testing (Ex. 38F/51-52). In April 2015, at an orthopedic evaluation, the claimant had slightly reduced right knee range of motion and hypermobility (Ex. 36F/33). In May 2015, she had decreased right shoulder range of motion, hyperextension of the knees, and skin lesions (Ex. 37F/8). In June 2015, at a physical therapy evaluation, she had reduced lower extremity strength; however, the record indicates her strength was increased from her initial evaluation (Ex. 34F/2). At a neurological evaluation, she had mild left eye disc enlargement with a blurred disc margin as

well as increased reflexes in the right lower extremity, a positive Spurling's maneuver on the right, and difficulty performing tandem gait testing (Ex. 35F/5). During a rheumatology evaluation in July 2015, the claimant presented with trigger points and hyperextension (Ex. 42F/4-6). At an orthopedic evaluation in November 2015, the claimant had reduced right shoulder range of motion (Ex. 38F/35). In December 2015, the claimant had decreased sensation in the right extremities and positive straight leg raise testing on the right with difficulty performing gait testing (Ex. 35/1-2). During orthopedic evaluations in March 2016, the claimant had mildly abnormal left knee range of motion with positive provocative meniscal testing (Ex. 36F/30 and 38F/12). In April 2016, at a physical therapy evaluation, the claimant had decreased sensation in the right upper extremity, reduced upper extremity range of motion and cervical extension, and reduced strength throughout (Ex. 45F/l 7 and 24; *See also* Ex. 45F/15-16). She presented with multiple sores in April 2016, which she attributed to being off antibiotics for Lyme disease (Ex. 47F/9; *See also* Ex. 47F/13). At a psychological consultative evaluation in May 2016, she had a limping gait (Ex. 41F/4). In July 2016, the claimant presented with abnormal right knee motion (Ex. 51F/l). In August 2016, she had reduced, but symmetrical, ankle reflexes (Ex. 49F/5). During a physical therapy evaluation, she had reduced grip strength and right wrist range of motion, positive Tinel and Phalen's sign, and sensitivity to touch (Ex. 52F/5-9).

However, the claimant otherwise presented with unremarkable findings. She frequently had a stable, normal, or steady gait (Ex. 5F/7; 7F/3-4, 15; l 7F/33; 30F/2; 31F/6; 32F/7, 18; 34F/l l; 35F/l-2, 5-8; 36F/30-33; 38F/12-13, 51-52; 39F/13, 24; 45F/24; and 47F/8-9). In January 2013, the claimant had good muscle tone with no neurological deficits or tenderness upon palpation of the neck and back (Ex. 5F/7). At an office visit, she had intact strength with the balance of her ocular examination considered normal (Ex. 7F/15). During a neurological evaluation in February 2013, the claimant's neurological assessment was relatively normal and, on cursory evaluation, her optic discs and visual fields appeared normal (Ex. 6F/16). At an evaluation with her primary care provider, she had a benign neurological examination with good grip strength, subsequently presenting with normal leg lifts (Ex. 7F/5-7). In March 2013, during a neurology evaluation, the claimant presented without neurological deficit and had normal findings on ophthalmic examination (Ex. 6F/19). During an evaluation with her primary care provider, she had the ability to get on and off the examination table with ease, as well as intact deep tendon reflexes and strength (Ex. 7F/3-4). In April 2013, she had full range of motion of the neck with no tenderness (Ex. 22F/5). In July and August 2013, she had full range of motion of her neck with no tenderness (Ex. 8F/l and 12F/3). In August 2013, the claimant had normal reflexes with no tremor (Ex. 12F/3). In January 2014, she had full range of her neck with no tenderness (Ex. 15F/l). During an evaluation in March 2014, she had full range of motion of the neck without pain and presented with no tenderness during an evaluation of the musculoskeletal system (Ex. 16F/4). She had normal reflexes with no tremor (Ex. 16F/4). In April 2014, she presented with generally unremarkable findings including no tenderness

to palpation of the back or neurological deficits (Ex. l 7F/33-35). Despite reporting pain, she was observed moving her arms around (Ex. l 7F/36). Subsequently in April 2014, during an emergency room evaluation of right shoulder pain after a fall, the claimant presented without acute distress and she had normal range of motion and strength with no swelling (Ex. 17F/13). She presented with normal range of motion and alignment of the back with no tenderness as well as neurovascular findings with no sensory or motor deficits (Ex. 17F/13). In May 2014, the claimant presented with normal range of motion of the neck with no tenderness of the neck, back, or extremities (Ex. 19F/4). She presented with normal motor and sensory function (Ex. 19F/4). At a later evaluation in May 2014, she had good strength of the rotator cuff (Ex. 20F/l). She subsequently presented with normal findings upon musculoskeletal evaluation as well as intact sensation, adequate spinal range of motion, and normal muscle tone with no atrophy (Ex. 24F/3, 9; and 25F/2, 6, 10). In June 2014, although she sometimes had an abnormal gait when staff was watching her, she otherwise generally had a stable gait with appropriate muscle strength and no atrophy (Ex. 26F/2-5, 18, and 23-34).

In July 2014, the claimant had unremarkable findings upon cranial nerve testing, as well as normal coordination with intact strength and reflexes in all limbs with no atrophy (Ex. 30F/2). In August 2014, she presented with normal right shoulder strength with no atrophy, crepitus, or tenderness to palpation (Ex. 29F/2-3). During a neurology evaluation in October 2014, the claimant had unremarkable findings upon cranial nerve testing, normal coordination, and intact strength, sensation, and reflexes in all limbs with no atrophy (Ex. 34F/l l). In February 2015, the claimant had improved range of motion in the right upper extremity with no weakness (Ex. 36F/27). She also had no instability upon examination of the right knee (Ex. 36F/27). In March 2015, as well as in June 2015, she had reduced motor strength in the right extremities; however, it was noted to be due to give away weakness (Ex. 35F/4-7). The claimant had equally reactive pupils, full visual fields, unremarkable visual acuity, intact sensation to vibration, and increased reflexes in the left lower and bilateral upper extremities, with intact sensation to light touch, pinprick, and vibration also observed in June 2015 (Ex. 35F/5-7). During an orthopedic evaluation in March 2015, the claimant had a normal strength (Ex. 38F/51-52). In May 2015, she had full range of motion of the neck with no tenderness (Ex. 37F/8). During rheumatology evaluations in July 2015, she had no apparent weakness of the extremities or swollen joints (Ex. 42F/2-6). She was able to make a full fist bilaterally during the first evaluation, with a full fist on the left and 90 percent fist closure during a second evaluation (Ex. 42F/2-6). She had full range of motion of the wrists (Ex. 42F/6). At the second rheumatologic evaluation, it was noted her joint exam was unremarkable (Ex. 42F/2-3). It was determined that she did not have rheumatoid arthritis or other inflammatory arthropathies, with Lyme arthritis unable to be documented (Ex. 42F/l). Upon evaluation in October 2015, the claimant had full range of motion of the neck (Ex. 38F/35). In December 2015, the claimant had intact sensation of the trigeminal nerve, full visual field, and intact strength in all extremities (Ex. 35F/l-2; *See also* Ex. 39F/3). She had full

range of motion of the neck with no tenderness (Ex. 37F/4). During an evaluation in February 2016, she had intact sensation, hip range of motion, strength, and left knee stability (Ex. 38F/12-13). In March 2016, she had intact quad strength, normal hip range of motion, and intact left knee stability (Ex. 36F/30; *See also* Ex. 47F/13). She presented with normal movement of all extremities during another evaluation in March 2016 (Ex. 47F/13). In April 2016 her knee range motion within functional limits (Ex. 45F/l 7 and 24; *See also* Ex. 43F/3). During an additional evaluation, she had normal movement of all extremities with intact sensation (Ex. 47F/8-9). In July 2016, the claimant had normal deep tendon reflexes, stability of the right knee, and negative straight leg raise testing (Ex. 5lF/1). Although the claimant indicated she had pain, it was noted it was difficult to indicate any objective findings (Ex. 51F/l- 2). In August 2016, she had intact sensation and coordination (Ex. 49F/5). In September 2016, the claimant had normal range of motion of the back with normal alignment (Ex. 58F/4).

The medical evidence of record demonstrates generally conservative treatment for the claimant's severe physical conditions. The claimant has been treated with medication, including, at times, narcotic pain medication *(See, generally,* Ex. lF; 4F; 6F-l 1F; 14F-18F; 20F; 22F; 25F-27F: 35F- 37F; 49F; and 53F). She has reported having a medical marijuana card *(See* Ex. lF/1; 4F/7; 7F/3; 19F/3; 28F/3). In April 2013, she was advised to cut back on her use of marijuana and tramadol as overuse could lower natural pain control (Ex. 9F/2). The claimant has participated in physical therapy and received injections (Ex. 2F; 29F, 34F; 38F; 40F; 45F; 49F; and 51F-52F; *See also* Ex. 18F/2; and 36F/6, 30, 50-60). However, the record does not demonstrate that the claimant had surgery or that she was advised to undergo surgery. Despite the claimant's allegations of ongoing symptoms, the record shows that, at least at times, the claimant has presented with or reported improvement with treatment. In February 2013, the claimant noted her pain was under control with medication and that her headaches were decreased (Ex. 7F/5). In March 2013, although she indicated she had a recent increase, she reported she had been doing fairly well with regard to her headache with use of medication (Ex. 6F/19). In April 2013, she noted improvement in pain and nausea with medication, reporting in August 2013 that she had improved sleep with medication (Ex. 13F/l and 22F/30). In September 2013, the claimant reported some improvement in her overall symptoms with use of a muscle relaxer (Ex. l0F/1). In January 2014, the claimant reported improvement in her headaches with new glasses, noting she had more good days than bad (Ex. 15F/l). In February 2014, she reported improvement with use of medical marijuana (Ex. 18F/3). In July 2014, the claimant noted improvement in her tension headache, stating in October 2014 that she had improving headaches with medication (Ex. 30F/2-3 and 35F/10). In September 2014, she reported improvement in her pain with a steroid shot into her right shoulder (Ex. 36F/44). In January 2015, at the time of discharge from physical therapy, it was noted she had improved motion in her right shoulder (Ex. 34F/16; *See also* Ex. 34F/24). In May 2015, the claimant reported improvement with treatment, noting she could do more activities (Ex. 37F/8). In June 2015, upon discharge from physical therapy, the

claimant demonstrated improved strength of the bilateral lower extremities and improved tolerance to daily function and weight bearing activities (Ex. 34F/l; *See also* Ex. 34F/8). She reported improvement in her headaches (Ex. 35F/4-5; *See also* Ex. 37F/3). In September 2015, the claimant noted she felt the best she had in four years (Ex. 37F/6). In March 2016, the claimant reported relief from a right knee and shoulder injections (Ex. 36F/30 and 38F/8-9; *See also* Ex. 38F/12). In May 2016, she presented with improved upper extremity strength and range of motion following physical therapy treatment (Ex. 45F/l land 14). In August 2016, she noted a new antibiotic was helping (Ex. 54F/2). She indicated she was benefiting from seeing a pain management psychologist (Ex. 55F/l). In September 2016, the record indicates the claimant wrist range of motion was improving (Ex. 52F/2). During a telephone consultation, she noted some ongoing symptoms, but reported she was feeling better overall (Ex. 53F/l). At the hearing, the claimant reported a preventative medication was helping her headaches and that physical therapy and injections have also helped.

The medical evidence shows the claimant is obese. In July 2015, the claimant was five feet, five inches tall (Ex. 42F/5). She weighed 260 pounds, which suggests a body mass index of 43.26, which is within the range of obesity (Ex. 42F/5). She has been advised to lose weight (Ex. 30F/3 and 42F/4). Pursuant to the Regulations, the undersigned considered how weight affects the claimant's ability to perform routine movement and necessary physical activity within the work environment. The undersigned is aware obesity is a risk factor that increases an individual's likelihood of developing impairments in most body symptoms. Obesity can lead to limitation of function. The effects of obesity may not be obvious. The combined effects of obesity with other impairments may be greater than might be expected without the disorder. The undersigned considered any added or accumulative effects the claimant's obesity played on her ability to function, and to perform routine movement and necessary physical activity within the work environment.

Turning to the claimant's mental impairments, the record shows the claimant has some limitations arising from an anxiety disorder, a history of ADHD, and an affective disorder, primarily bipolar disorder; however, the objective medical evidence of record does not support the extent of the claimant's alleged limitations. The claimant reported subjective symptoms including disorientation, confusion, word finding difficulty, reduced energy, motivation loss, increased speech, racing and illogical thoughts, hyperactivity, hallucinations, panic and anxiety attacks, anger, and irritability with difficulty sleeping, being around groups, concentrating, and remembering *(See* Ex. 6F/4, 8; l lF/1; 16F/2; 22F/15, 20-26; 26F/25, 32; 31F/2-4; 32F/4, 14, 23; 37F/8-10; 39F/l l-49; 41F/l-2; 46F/l-10; 53F/4; 54F/l-9; and 55F/l). In May 2014, she sought emergent evaluation of manic symptoms, reporting hallucinations and lack of sleep for five to six days, although she denied having suicidal and homicidal ideation (Ex. 24F/l and 13; *See also* Ex. 25F/4, 13). In June 2014, the claimant reported having hallucinations and irrational thoughts (Ex.

26F/7 and 27F/3). She has been diagnosed with ADHD, bipolar disorder, and an anxiety disorder (Ex. 7F/22; 25F/l; 26F/8; and 28F/8).

However, in July 2013, the claimant denied having psychiatric symptoms (Ex. 13F/2 and 5). In March 2014, she denied experiencing hyperactivity and decreased concentration (Ex. 16F/4). Upon discharge from the hospital in June 2014, she denied having suicidal and homicidal thoughts (Ex. 26F/l; *See also* Ex. 26F/4). In August 2014, she denied experiencing depression (Ex. 27F/l). During a psychiatric evaluation, she noted she had a good mood with no suicidal or homicidal ideation (Ex. 31F/4). In May and June 2015, the claimant indicated her symptoms were mild (Ex. 39F/39-45). In August and December 2015, she denied depressed and manic episodes (Ex. 39F/l and 11). In April 2016, she denied having depressed and manic episodes, noting she felt she was managing her anxiety overall (Ex. 43F/l). At an August 2016 medication review, the claimant continued to deny recent depressed or manic episodes, noting she managed her mood and anxiety well overall (Ex. 55F/1).

The objective examination findings related to the claimant's mental impairments do not support the extent of the claimant's alleged limitations. In February 2013, the claimant appeared anxious; however, she was only mildly anxious and that her anxiety dissipated as her situation was discussed (Ex. 7F/7). In April 2014, she appeared anxious and tearful, appearing "hysterical" at times although she was cooperative (Ex. 17F/33-36). In May 2014, she was anxious with equivocal motivation, but was also noted to have an appropriate mood and affect (Ex. 24F/3 and 9). While hospitalized, she had a constricted mood and affect, subsequently appearing depressed (Ex. 25F/8-10). Upon discharge from inpatient treatment, she had limited insight and judgment (Ex. 25F/2). While hospitalized in June 2014, she had, at times, pressured and/or tangential speech, poor insight, mild suspiciousness, disheveled appearance, circumstantial thoughts, poor eye contact, delusions, and an abnormal mood and affect with distractibility and limitations in memory, attention, and concentration initially observed (Ex. 26F/5-34). Subsequently in June 2014, after discharge, she had an anxious affect with her speech was slightly pressured and her thoughts were tangential (Ex. 28F/8). At therapy sessions between April and June 2015, she had a somewhat anxious and depressed affect, presenting with a blunt, anxious, and depressed affect in July 2015 (Ex. 39F/34-52). At a therapy session in August 2016, the claimant had an irritable mood and difficulty sitting still, subsequently presenting with impaired functional status and an irritable mood (Ex. 54F/2-3).

However, the claimant otherwise presented with unremarkable mental status examination findings. She often appeared cooperative, pleasant, polite, and/or friendly (Ex. 17F/13; 24F/2-3; 25F/2; 26F/l-2; 28F/8; 31F/6-9; 32F/7-19; 35F/10; 36F/33, 46; 38F/12, 35; 39F/3-25; 41F/4; 43F/1-5; 51F/1; 55F/2-4; and 58F/4). In March 2013, as well as in January 2013, she had an appropriate affect (Ex. 7F/3 and 15). In August 2013 and March 2014, she had normal mood, affect, speech,

behavior, judgment, thought content, cognition, and memory with normal mood, affect, judgment, and insight observed in February 2014 (Ex. 12F/3; 16F/4; and 18F/3). In April 2014, the claimant had an appropriate mood and affect (Ex. 1 7F/13). In May 2014, despite reporting manic symptoms, the claimant had an appropriate mood and affect (Ex. 24F/2-3). She was texting and did not appear to be in any acute distress (Ex. 24F/2). Upon discharge from inpatient treatment, the claimant had good hygiene, normal speech and language, a euthymic mood with a congruent affect, intact associations, future-oriented thought processes, intact memory, and appropriate concentration and attention with no hallucinations, suicidal ideation, or homicidal ideation (Ex. 25F/2; *See also* Ex. 25F/10). In June 2014, upon discharge from inpatient treatment, the claimant had good hygiene, regular speech, a euthymic affect, linear and logical thought processes, intact associations, and improved insight and judgment (Ex. 26F/2; *See also* Ex. 26F/5). It was noted she was very cooperative and friendly during her hospitalization with appropriate interaction (Ex. 26F/l-2). While hospitalized, she often had at least fair memory, attention, and concentration (Ex. 26F/12 and 19-26; *But see* Ex. 26F/3 l). In July 2014, she had intact attention, concentration, and short-term memory with normal language and speech (Ex. 30f/2). During a psychiatric evaluation in August 2014, the claimant had appropriate dress, good eye contact, calm motor behavior, normal speech and language, a euthymic affect, logical thought processes, intact associations, intact insight and judgment, intact concentration, and no prominent memory or executive functioning concerns with no evidence of delusions or hallucinations (Ex. 31F/6-9). In October and December 2014, she had appropriate dress, good eye contact, and calm motor behavior with intact short-term memory, attention, and concentration as well as normal language and speech observed during a neurology evaluation in October 2014 (Ex. 32F/7, 18-19; and 35F/10). In March and June 2015, as well as in December 2015, the claimant had intact language (Ex. 35F/l-8). In April and October 2015, she was well kempt with an appropriate mood (Ex. 36F/33 and 38F/35). At medication reviews in June, August, and December 2015, she had appropriate dress, calm motor behavior, normal speech and language, intact associations, and logical and linear thoughts (Ex. 39F/3-25). During rheumatological evaluations in July 2015, the claimant had a good affect with normal recent and remote memory (Ex. 42F/2-6).

The claimant appeared well kempt in February 2016 (Ex. 38F/12). She had a normal mood in March 2016 (Ex. 47F/13). In April 2016, the claimant had a euthymic affect, appropriate dress, good eye contact, calm motor behavior, normal speech and language, logical thought processes, and intact associations (Ex. 43F/1-5). In May 2016, during her consultative evaluation, the claimant had appropriate hygiene and manners (Ex. 41F/4). She had adequate insight, logical and organized thought processes, and clear speech with intact memory and concentration (Ex. 41F/4). She presented without evidence of psychosis or a thought disorder (Ex. 41F/4). Her affect was within normal limits (Ex. 41F/4). She recalled two of three objects following a delay, recalling a third when give[n] multiple choices (Ex. 41F/4). She was able to perform simple calculations, including serial three and seven

subtractions (Ex. 41F/5). In July 2016, she appeared well kempt with an unremarkable mood (Ex. 46F/4 and 51F/l). In August 2016, she had intact comprehension with the ability to follow commands (Ex. 49F/5). At a medication review, she had appropriate dress, a calm/euthymic affect, good eye contact, calm motor activity, normal speech and language, intact associations, logical and linear thought processes, and intact attention and concentration (Ex. 55F/2-4). During a therapy session, she was interactive, alert, and oriented with an appropriate affect, a euthymic mood, and intact functional status (Ex. 54F/5). At a subsequent therapy session, she was interactive, alert, and oriented with an appropriate affect and intact functional status (Ex. 54F/3). At an additional therapy session, she was interactive, alert, and oriented with an appropriate affect (Ex. 54F/2). In September 2016, during a therapy session, she was interactive, alert, and oriented with an appropriate affect, a euthymic mood, and intact functional status (Ex. 54F/l). During a physical evaluation, she had an appropriate mood and affect (Ex. 58F/4).

Although the claimant has a history of inpatient psychiatric treatment, the claimant's treatment that is more recent has been generally conservative. The claimant has been prescribed medication to treat her mental impairments and that she has participated in some counseling *(See, generally,* Ex. 6F-7F; 25F-26F; 31F-32F; 39F; 46F; and 54F-55F). In May 2014, she participated in voluntary inpatient hospitalization from May 20 to May 23, 2014 (Ex. 24F and 25F). She hospitalized on an involuntary basis from June 7 to June 18, 2014 (Ex. 26F). However, there is no indication of any inpatient or emergent treatment since June 2014, as well as no evidence of a need for intensive case management.

The medical evidence of record also demonstrates some improvement with treatment. In February 2014, the claimant noted that Adderall was working well, remarking that her focus was good (Ex. 18F/3). In May 2014, upon discharge from inpatient treatment, the claimant reported improvement with a stabilized mood and improved appetite, sleep, and self-care (Ex. 25F/2). In June 2014, she reported improvement in her anxiety with medication (Ex. 26F/l). Upon evaluation in October 2014, she stated she had improved attention and motivation (Ex. 32F/15). Upon evaluation in November 2014, it was noted she had improvement in mood with use of medication (Ex. 37F/10). In December 2014, the claimant reported that things were better overall (Ex. 32F/4). In May 2016, the claimant reported improvement in her irritability and sleep with medication (Ex. 41F/l). In April and August 2016, it was assessed the claimant's bipolar disorder was in full remission (Ex. 43F/9 and SSF/10). At the hearing, the claimant reported improvement in ADHD symptoms with Adderall. She testified that her bipolar disorder is improved with medication, noting she has not had any flares in two years. She stated that weekly counseling also helps her mental health symptoms.

The undersigned also considered the claimant's activities of daily living, which at times suggest a higher level of functioning than generally alleged by the claimant. The claimant alleged significant limitations in activities of daily living, including

no driving due to lack of alertness, daily naps, a need for reminders to go places, and reminders to take medication with difficulty preparing meals when having a flare of her Lyme disease (Ex. 5E/1-5; 9E/l-6; and Testimony). However, in April 2013, she reported she could perform personal care tasks independently without difficulty or need for special reminders, prepare simple meals, wash laundry and dishes, sweep, shop for groceries, run errands, handle her own finances, participate in a social group, watch television and movies, and play videogames (Ex. 5E/2-6). In October 2013, she stated she provided some care for a dog, attended to her personal care independently and without difficulty or special reminders, prepared simple meals daily, washed laundry, performed some cleaning, shopped, handled her own finances, watched television, read, and played videogames as well as regularly participated in a social group (Ex. 9E/l-6). In May 2016, she stated she attended to her personal care, performed light housework, prepared simple meals, and drove for periods up to 45 or 60 minutes, remarking she also tried to get out with friends or meet with her mother regularly (Ex. 41F/3). At the hearing, the claimant reported she washes laundry, shops in stores, and sometimes drives. She testified she tries to get out of her home every other day, noting she visits friends. In addition to the above noted daily activities, the claimant reported in May 2016 that she went hunting (Ex. 41F/3). At a physical therapy session, she noted she drove 14 hours to Alabama and back again (Ex. 45F/15). In September 2016, she noted she had been golfing (Ex. 52F/l). Weighing all relevant factors, the undersigned concludes that the claimant's subjective complaints do not warrant any additional limitations beyond those established in the residual functional capacity outlined in this decision.

(PageID.60-68).

## II.        The ALJ Properly Evaluated the Opinion Evidence

As discussed below, two of Plaintiff's care providers offered opinions that Plaintiff was more limited than the ALJ recognized in his RFC assessment.   The ALJ, however, afforded little weight to these opinions.   Plaintiff argues that she is entitled to relief because the ALJ's rationale for discounting the opinions in question is not supported by substantial evidence.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition.   *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).   An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent

with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

A.    Dr. Kimberly Lentz

On October 23, 2013, Dr. Lentz completed a form report regarding Plaintiff's ability to perform physical work-related activities. (PageID.788-90). The doctor reported that Plaintiff could sit or stand/walk "without interruption" for "less than 3 min" each. (PageID.788). The doctor reported that during an 8-hour work day, Plaintiff could sit and stand/walk for "less than 1 hour" each. (PageID.788). The doctor further reported that Plaintiff could not even "tolerate" a sit/stand option. (PageID.789). The doctor reported that Plaintiff could "rarely" lift/carry 5 pounds, but could "never" lift/carry 10 pounds. (PageID.789). The doctor reported that Plaintiff could not operate a motor vehicle and would need to take "frequent" unscheduled breaks throughout the workday. (PageID.789). The doctor concluded by stating that Plaintiff

"is not able to work at this time due to her extreme symptoms." (PageID.790). On May 28, 2014, and again on July 20, 2016, Dr. Lentz reiterated these opinions by simply re-signing the form she completed in 2013. (PageID.885-87, 1364-66).

In support of his decision to afford "little weight" to Dr. Lentz's opinion, the ALJ articulated several reasons. The ALJ noted that the opinion that Plaintiff could "rarely" lift 5 pounds was vague because the doctor did not define the term "rarely." (PageID.71). The ALJ noted that the doctor's opinions were inconsistent with her own treatment notes. (PageID.71). While the record contains few treatment notes regarding Plaintiff's treatment with Dr. Lentz, these notes support the ALJ's assessment that while Plaintiff is very limited, she is not as impaired as Dr. Lentz asserts. (PageID.783, 812-13, 1012, 1194-1204, 1476-80).

The ALJ also noted that Dr. Lentz's opinions "are not consistent with the weight of the medical evidence of record as a whole discussed in detail above, including objective examination findings that were unremarkable at times, diagnostic imaging studies and testing generally showing no more than mild findings, and the longitudinal treatment record demonstrating relatively conservative treatment with some improvement from treatment (Ex. 1F-59F)." (PageID.71). Finally, the ALJ observed that Plaintiff's "activities, including her ability to attend to personal care tasks independently, prepare simple meals, drive, perform some household chores, play videogames, and shop as well her reports in May 2016 of hunting and driving to Alabama and golfing in September 2016, do not support the extent of the limitations assessed by Dr. Lentz *(See* Testimony; Ex. 5E; 9E; 41F; 45F; and 52F)." (PageID.71). In sum, the ALJ expressed good reasons, supported by substantial evidence, for discounting Dr. Lentz's opinion. Accordingly, this argument is rejected.

19

B.    Jamie Wilson, M.A.

On August 24, 2016, Jamie Wilson, a therapist with whom Plaintiff treated, completed a "Medical Source Statement" regarding Plaintiff's limitations in 13 separate categories encompassing (1) making occupational adjustments; (2) making personal/social adjustments; and (3) functional limitations.   (PageID.1430-31).   Wilson reported that Plaintiff experienced "no or mild limitations" in the activities of daily living, but that her limitations were "extreme" and work preclusive in the remaining 12 categories.   (PageID.1430-31).

In support of his decision to afford "little weight" to Wilson's opinion, the ALJ articulated several reasons.   The ALJ noted that Wilson's extreme opinion was not consistent with his own treatment notes.   (PageID.72).   For example, just one week prior to opining that Plaintiff suffered from numerous extreme and work preclusive limitations, Wilson reported that Plaintiff was "oriented" and "alert," with "appropriate" affect and "intact" functional status. (PageID.1487).   Wilson further characterized Plaintiff's interpersonal status as "interactive" and her mood as "euthymic."   (PageID.1487).   On August 24, 2016, and August 31, 2016, Wilson reported that Plaintiff was "irritable," but otherwise failed to note anything remarkable or consistent with the opinion that Plaintiff experienced numerous extreme and work preclusive limitations.   (PageID.1484-86).   On September 14, 2016, Wilson again reported that Plaintiff was "interactive," "oriented," and "alert," with "appropriate" affect, "intact" functional status, and "euthymic" mood.   (PageID.1483).

The ALJ accurately concluded that Wilson's "assessment of extreme limitations is not consistent with the medical evidence of record, which demonstrates often unremarkable mental status examination findings, generally conservative treatment since. . .the claimant's 2014

hospitalizations, and improvement with treatment *(See, generally,* Ex. 6F-7F; 11F-13F; 16F-18F; 22F; 24F-28F; 30F-32F; 35F-39F; 41F-43F; 46F-47F; 49F; 51F; 53F-55F; and 58F)." (PageID.72). The ALJ also accurately observed that Wilson's opinion "is not consistent with the claimant's ability to attend to her personal care independently, drive, prepare simple meals, perform some household chores, shop, run errands, handle her own finances, watch television and movies, play videogames, and participate in social groups regularly, as well as her report of hunting, driving to Alabama, and golfing (Ex. *SE;* 9E; 41F; 45F; 52F; and Testimony)." (PageID.72). In sum, the ALJ expressed good reasons, supported by substantial evidence, for discounting Wilson's opinion. Accordingly, this argument is rejected.

### III.        The ALJ's RFC Finding is Supported by Substantial Evidence

A claimant's RFC represents the "most [a claimant] can still do despite [her] limitations." *Sullivan v. Commissioner of Social Security*, 595 Fed. Appx. 502, 505 (6th Cir., Dec. 12, 2014); *see also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents her ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule"). The ALJ concluded that Plaintiff can perform a limited range of sedentary work. Plaintiff argues that the ALJ's RFC fails because the ALJ failed to cite to any specific evidence in support thereof.

The ALJ is tasked with determining a claimant's RFC. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c). While the ALJ may not "play doctor" and substitute his own opinion for that of a medical professional, the ALJ is not required to tailor his RFC assessment to any particular opinion or item of medical evidence. *See, e.g., Poe v. Commissioner of Social Security*,

342 Fed. Appx. 149, 157 (6th Cir., Aug. 18, 2009). Instead, the ALJ is "charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of her residual functional capacity." *Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004). This is precisely what the ALJ in this matter did and the ALJ's RFC assessment is supported by substantial evidence. Accordingly, this argument is rejected.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Dated: March 29, 2019                                  /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge